7001

## STATE OF SOUTH CAROLINA v. MALONY & CARTER.

1. EVIDENCE—LETTERS.—In an action by the State to enforce a statutory penalty for not paying tax on fertilizers it is not reversible error to rule out a letter from manufacturer to its agent that they were out of tax tags for the moment and he could tag the fertilizer on arrival as the agent testified to that fact, nor was the letter admissible to show motive as that issue was not raised by the pleadings.

2. CHARGE—WRITTEN INSTRUMENTS—BILL OF LADING—CONTRACTS.—It is duty of trial Judge to construe all written instruments. Here the Judge should have construed the contract and instructed the jury that the purchaser obtained no title to the goods until he paid the draft attached to the bill of lading and thus obtained the bill of lading, and not have submitted to jury the issue when the purchaser obtained title. His action was further prejudicial to appellant because the goods were attached before purchaser obtained title.
   MR. JUSTICE JONES *dissents, on ground that this issue was not sent to the jury.*

3. NONSUIT—FERTILIZERS.—Under proof here it was proper to refuse nonsuit, as it is unlawful for anyone to receive or deliver fertilizers which do not bear the prescribed tax tags.

4. IBID.—Motion for nonsuit made on the ground that there is no evidence to show defendant had violated the law, is too general.

Before KLUGH, J., Orangeburg, October term, 1907. Reversed.

Action by State of South Carolina against Malony & Carter, The Cudahy Packing Company and Jennings & Smoak. From judgment for plaintiff, the defendant, The Cudahy Packing Company, appeals.

*Messrs. Miller, Whaley & Bissell* and *Raysor* and *Summers,* for appellant, cite: *Letter of appellant to Malony & Carter unlawfully excluded:* Jones on Ev., sec. 599; 24 Ency., 672; 1 Wall., 637. *Judge should have construed the contract:* 17 S. C., 480; 33 S. C., 253; 19 S. C., 124, 367; 15 S. C., 10, 296; 22 S. C., 288, 473; 24 S. C., 497; 6 Cyc., 419; 115 Ill., 407. *No title is transferred by bill of lading*

*to order of shipper until bill of lading is in possession of purchaser:* 25 S. C., 216; 72 S. C., 254.

*Attorney-General J. Fraser Lyon* and *Messrs. Glaze & Herbert,* contra.    *Messrs. Glaze & Herbert* cite: *There was no error in excluding letter of appellant to Malony & Carter:* 13 Ency., 259.

September 1, 1908.    The opinion of the Court was delivered by

MR. JUSTICE GARY.    This action was brought by the State, to recover the penalty for selling fertilizers without attaching the tax tag required by the statute.

The complaint (omitting the formal parts thereof), alleges, that on or about the first day of November, at Orangeburg, S. C., the defendants, The Cudahy Packing Company, and Malony & Carter, sold and delivered to the defendants, Jennings & Smoak, twenty-five tons of commercial fertilizers, at the price of seven hundred dollars, upon which fertilizers the defendants had failed to pay the inspection tax of twenty-five cents per ton, and which did not bear the prescribed inspection tax tags or stamps, as evidence that the inspection tax had been paid as required by statute.

That the defendants, Jennings & Smoak, are now in possession of the said fertilizers, and are proceeding to resell the same, and already have resold a portion thereof.

That by failing and neglecting to pay the prescribed inspection tax, and to attach the inspection tags to said fertilizers, the defendants have violated the statutes of the State, have incurred the penalty and become liable to the State in the sum of money equal to the price of the fertilizers.

The defendants denied these allegations.

The jury rendered a verdict in favor of the plaintiff against the defendant, The Cudahy Packing Company, for six hundred sixty-two and 50-100 dollars, and the said defendant appealed.

The first question that will be considered is, whether there was error on the part of his Honor, the presiding Judge, in refusing to allow the defendant to introduce in evidence the following letter:

"South Omaha, Neb., October 20, 1906.
"Messrs. Malony & Carter, Charleston, S. C.

"Gentlemen: We have your favor of the 17th inst., and we beg to inform you that the car for Orangeburg has not yet been gotten away, as we have been short of cars; but we are expecting to get it out either today or Monday. We are shipping this from our Kansas City house, where they have not any South Carolina tags at the moment, and we have, therefore, advised them to ship without tagging, rather than delay the same, and you can have it tagged on arrival. Very truly yours, The Cudahy Packing Company."

The only reason assigned why there was error is that "the presiding Judge should have admitted the said letter as the statement of the defendant, The Cudahy Packing Company, made, not subsequent to, but contemporaneously with, or prior to the transaction in question, and constituting a part of the *res gestae.*"

It will thus be seen that the exception fails to point out any specific error. The appellant, however, contends that the letter was competent, for the purpose of showing motive.

The pleadings do not raise an issue as to the motive of the defendant; nor was there reversible error in ruling that the letter was not admissible in evidence for the purpose of showing that the defendant could not get tags, when the shipment was made, as the witness, Patrick Carter, testified to this fact.

The second error assigned is because his Honor, the presiding Judge, charged the jury: "It is not for me to say whether The Cudahy Company did ship the goods to the order of Jennings & Smoak, or to their own order; that is for you to find from the testimony, if there is testimony to that effect."

The general rule is too well settled to necessitate the citation of authority that the construction of a written instrument presents a question to be determined by the Court, and not by the jury.

Let us see if the error was prejudicial to the rights of the appellant. Section 1536 of the Code of Laws provides that, "all persons, companies or corporations engaged in the manufacture, or sale of fertilizers, or commercial manures, or cotton seed meal, shall pay to the State Treasurer an inspection tax of twenty-five cents per ton (2,000 lbs.), for such fertilizers, or commercial manures, or fertilizing material, or cotton seed meal sold or exposed, or offered for sale in this State, in order to entitle the same to inspection and delivery; and all persons, railroad companies or common carriers, are hereby prohibited from selling, or exposing, or offering for sale, any commercial fertilizers, or commercial manures, or fertilizing materials, or cotton seed meal, that do not bear the prescribed inspection tax tag or stamp, as evidence that the said inspection tax has been paid to the State Treasurer, or his duly appointed agents. Every person or persons, company or corporation, violating this section, shall forfeit to the State the sum of money equal to the price of the fertilizers, commercial manures, fertilizing material, or cotton seed meal, sold, or exposed, or offered for sale, received, shipped or delivered without having the inspection tax tags attached, to be recovered in any court of competent jurisdiction." * * *

In the agreement entered into on the 8th day of August, 1906, between Malony & Carter and Jennings & Smoak, for the sale of said fertilizers, appears the following: "Sight draft with bill lading attached, to be paid on presentation for each shipment;" and in each of the bills of lading is the following, except in one, the "c|o" is omitted.

"Consignees and destination. Order, The Cudahy Packing Company. Notify: c|o Jennings & Smoak, Orangeburg, S. C."

These words show that the title to the property was not to vest in Jennings & Smoak until the draft, with bill of lading attached, was paid. *Grocery Co.* v. *Brooke,* 70 S. C., 494.

R. H. Jennings, a member of the firm of Jennings & Smoak, testified as follows: "Q. Do you remember when the first shipment arrived? A. Yes, sir. On the first of November. Q. Did Mr. Mackey call your attention to the fact that there were none of these tax tags on the fertilizer? A. Yes, sir; that was my first knowledge of the matter when he called it to my attention. Q. This contract calls for a first shipment in December? A. Yes, sir, I wrote to them and told them that I would want it a little earlier, on account of using it for oats. Q. And the reason that this first shipment was made then was on account of that letter? A. Yes, sir. Q. When did it get here? A. On the first of November. I had sold some to Mr. Bates, and he was very anxious for his—he wanted to plant some oats, and I phoned to him as soon as it arrived."

Cross-examination: "Q. The drafts stayed in the People's Bank from the eighth till the twelfth of November? A. I guess so, sir. Q. You could not get your bill of lading till the draft was paid? A. No, sir. Q. They did not come into your possession until the draft was paid? A. No, sir. Q. Your contract was that the fertilizer was to be shipped to you, bill of lading attached? A. Yes, sir. Bill of lading introduced. Q. On the afternoon of the seventh did you not receive a package of tags for the fertilizer? A. I received them. I do not know that it was the afternoon of the seventh. Q. Those tags were cancelled? A. Yes, sir; they were stamped. Q. Those were the tags for that fertilizer, and they were shipped on the seventh, and were received by you on the eighth? A. I don't remember that, sir. Q. They were to cover that fertilizer that had no tags on it? A. Yes, sir. Q. Were they ever put on the fertilizer? A. Not till a good many days after that, sir. Q. You telegraphed Malony & Carter, and received a letter from them? A. Yes, sir. Q. They told you that the tags would be sent?

A. Yes, sir.   Q. And you got them?   A. Yes, sir.   Q. The fertilizer was tagged?   A. Not till a good many days after that.   Q. Why did you not tag the fertilizer?   A. My help was busy at the time and they did not expect me to hire any one, and I had to wait till I got the time to do it.   Q. The tax was paid and the State of South Carolina did not lose anything—the tags were paid for?   A. They did not lose a cent, sir.   Q. You knew that the attachment proceedings was being gotten out?   A. Yes, sir, I did.   Q. During the time that they were getting these papers out, you still did not pay the draft?   A. No, sir, I don't know when the draft was paid.   Q. Did not Malony & Carter, in reply to your telegram, tell you?   Objection, hearsay.   Q. What did Mr. Carter tell you in reply to your telegram?   Did not Mr. Carter tell you that he was shipping you a bundle of tags to be put on that car, before the delivery of that car?   Objection.   His Honor: I will allow the question.   A. I would not deny that or affirm it.   Q. You know that you got the tags?   A. Yes, sir; they were received.   Q. They must have been received the morning after they were sent to you?   A. They must have been, sir.   Q. Was every bag of fertilizer that came in that car tax paid?   A. Yes.   Q. To whom did you sell these fertilizers?   A. I sold five tons to Mr. Bates in November.   Q. There were seven tons sold out before the tags were received?   A. Yes, sir; there were five tons sold to Mr. Bates, and two tons carried to our plantation.   Q. This of Mr. Bates was sold before Mr. Mackey came around?   A. Yes, sir; probably the same day; I know the fertilizer had just come in.   Q. You had sold it before the inspector came around, had you delivered any of the fertilizer before Mr. Mackey came around?   A. Yes, sir; the day that goods arrived I phoned Mr. Bates and he got his.   Q. Mr. Bates says that that was on the second?   A. I don't remember, but I think that it was later than that."

Recross: "Q. When the car was delivered at your warehouse you had no bill of lading?   A. No, sir.   Q. When the sale was made to Mr. Bates, you had not received the bill

of lading? A. No, sir; it had not arrived. Q. The draft had not been paid? A. No. sir."

The following statement appears in the record: "It was admitted as testimony that Mr. H. O. Dawson, the express agent at Orangeburg, S. C., received the tags from Malony & Carter, on the train that reached Orangeburg, at 8 o'clock in the evening of the seventh day of November, 1906, and that these tags were delivered by him to Jennings & Smoak, about 10 o'clock on the following morning, being the 8th day of November, 1906.

"It was also admitted that the draft, with the bill of lading attached, was received by the People's Bank on the morning of the 8th day of November, 1906, being the day the tags were delivered by the express company to Messrs. Jennings & Smoak, and that this draft was not paid until the following Monday, November 12, on which day the bill of lading was delivered to Jennings & Smoak."

Patrick Carter, a member of the firm of Malony & Carter, testified as follows: "Q. When did you first know that these fertilizers were in Orangeburg? A. I got a telegram from Jennings & Smoak in Orangeburg, on the seventh of November, between 1 and 2 o'clock. Q. Did you know before that that the fertilizers were here? No, sir. Q. You had the bills of lading for the fertilizers? A. We did. Q. When were they sent up to Jennings & Smoak? A. On the afternoon of the seventh. Q. Did Jennings & Smoak have any right to the fertilizers before they got the bills of lading? Objection; that is a legal question and it is not competent for counsel to ask the witness that. His Honor: I think that question is competent. Q. What about the delivery of the fertilizer? A. I did not know that they were here till I got this telegram from Jennings & Smoak. Q. Did they have any right to take the fertilizer? A. No, sir. Q. Did you give the railroad any instruction, or any one any instructions to deliver it to Jennings & Smoak? A. No, sir; no one at all. Q. Why was it, Mr. Carter, that there were not tax tags on that fertilizer? A. Because the tags were exhausted, sir;

they had no more of them on hand.   Q. You know that? A. Yes, sir; this shipment to Jennings & Smoak was sent out earlier than was expected, and they had no tags at the time. I got the tags and cancelled them with my own hands, and sent them to Jennings & Smoak by the night mail.   I knew that they could not get possession of the fertilizer without the bill of lading, and we had that; so I thought that it was perfectly safe, and as soon as we knew the stuff had arrived, we complied with the law.   Q. When did you send up the bill of lading and the invoice?   A. It was mailed on the seventh; we sent it to our bank, and they sent it to the bank here—we mailed the invoice to them on the seventh.   Q. You mailed the invoice to Jennings & Smoak?   A. Yes, sir."

Cross-examination: "Q. You said the reason the tags were not put on the fertilizer was because they were exhausted, because they had no more tags?   A. Yes, sir.   Q. You never ship your fertilizer without putting these tax tags on it?   A. No, sir; we always stick up to the laws, sir; that is our motto.".

It will thus be seen that the refusal of his Honor, the presiding Judge, to construe the contract between Malony & Carter and Jennings & Smoak, deprived the appellant of a substantial right, as the title to the property did not vest in Jennings & Smoak until the 12th of November.

Under the charge of his Honor, the Circuit Judge, the jury may have reached the conclusion that the sale of the appellant to Jennings & Smoak was complete, when the latter came into possession of the fertilizers.

There is another reason why the jury should have been instructed that the title did not vest in Jennings & Smoak until the draft attached to the bill of lading was paid.

J. J. Mackey, the inspector of fertilizers, testified as follows: "The sheriff attached the fertilizer?   A. Yes, sir.   Q. Did you go with him when he attached it?   A. Yes, sir. Q. Who levied on it?   A. Mr. Tharin.   Q. When was the attachment made?   A. On the 12th of November."

It seems from the testimony that the draft was not paid until the attachment had been made. If this be true, then the law took possession of the property before the title became vested in Jennings & Smoak.

The last question that will be considered is whether there was error in refusing the motion for a nonsuit, which was made on two grounds; the first of which is as follows:

1. "That there was no evidence tending to show that The Cudahy Packing Company sold and delivered, or had sold and delivered the fertilizers in question, before the inspection tax had been paid."

This ground was properly overruled, for the reason that it is not only necessary for the party selling the fertilizers to pay to the State Treasurer the charge of twenty-five cents per ton, but such party is also "prohibited from receiving or delivering any commercial fertilizers * * * that do not bear the prescribed inspection tax tags or stamps in evidence that the said inspection tax has been paid to the State Treasurer, or his duly appointed agents."

The second ground was as follows: 2. "That there was no evidence tending to show that The Cudahy Packing Company had violated the law, as alleged in the plaintiff's complaint." This ground is too general to be considered.

The judgment of the Circuit Court is reversed, and the case remanded for a new trial.

MR. JUSTICE JONES *dissenting.* I am unable to agree to a reversal of the judgment. The charge which is the subject of the second exception, is a mere isolated sentence which, when read in the light of the context, does not submit it to the jury to construe a written contract.

The context is as follows: "Where property is shipped on a railroad to the order of the party who ships, marked, notify So-and-So, shipped to the order of the shipper, that is not a transaction which passes the title of the property to the party to whom the goods are shipped; that is, the party who is to

be notified of the arrival of the goods, the title in that case is still in the shipper, and where it is alleged that the title has passed from one person to another, that is a question of fact for the jury to decide.

"If, as a matter of fact, fertilizer or any other article is shipped to the shipper, order, notify some other party, and there has been contract made to sell this article and if this article is afterwards found in the possession of the party to whom the shipper had contracted to sell the article, then it is for the jury to determine whether the article came into the possession of this person by or with the concurrence of the shipper or not. If that should be the case in this case, the jury has a right to consider that in reaching their verdict and in determining whether there was a sale or not. But if the article came into the possession without the concurrence of the shipper, then the shipper could not be held to have been a party to the delivery of the goods. It is not for me to say whether The Cudahy Company did ship the goods to the order of Jennings & Smoak or to their own order, that is for you to find from the testimony, if there is testimony to that effect, it is not my duty to say whether such articles did come into the possession of Jennings & Smoak, and if they did come into the possession of Jennings & Smoak, whether it was with the concurrence of The Cudahy Company or Malony & Carter, that is a question for you to determine."

The judgment of the Circuit Court should be affirmed.